May it please the Court, my name is John Woo, and counsel, I'm here for the petitioner Donghong Ye. And if it pleases the Court, I'd like to reserve two minutes for rebuttal. The troubling aspect with this case is not so much that the petitioner has been in the United States for a decade, is facing deportation, or that during the interim he's raised a family, have children. I know the Court has seen many cases similar, or that the transcript in this case has duplications, omissions, and the immigration judge has forgotten to formally rule on motions to terminate. But the real troubling aspect really has to do with the immigration judge's refusal to order a competent interpreter for the mother of the petitioner to testify. You see, what happened was that she had arranged a marriage for her son, who was in China. The father had been persecuted and he died. She had arranged for his persecution, excuse me, for his son's marriage. He comes on a fiancé visa based on that arrangement. The mother even paid the then subsequent wife. So after these events occurred, in other words, the entering on the fiancé visa, the arrangement, the couple got married and they were interviewed, at which time they were separated and the ex-wife, now ex-wife, wrote a statement, well, the cousin had asked me to marry and I got $5,000, and then I came here and I got another $5,000 from the mother. And also, in deportation, in defending his deportation case, the petitioner had asked for a waiver if, in fact, if indeed his marriage was fraudulent. In other words, it was especially important for the mother to have been heard, but she spoke to have been heard because she had to be heard about the waiver. In other words, under the statute, a person may be granted a waiver of removability or an admissibility if a qualifying relative would suffer extreme hardship if he was to be removed. Also, he had asked that he not be deported because he had suffered past persecution. And the mother would have been a percipient witness at the time. He was two years of age when his father was persecuted. Even if she could have testified, all of the evidence that we have of what she would have said wouldn't have established that he was ever persecuted while he was in China. Well, okay. There's two troubling aspects surrounding that, the persecution as well as her testimony of the hardship that she would experience. The judge asked not a single question of the mother. She was in court. And although counsel had asked for an interpreter, which the court could have arranged easily, telephonically or a short continuance, he found, I guess the BIA thought the immigration judge had found, that it was a dilatory tactic for the counsel to have asked for an interpreter at that time. And but there was no evidence of dilatory tactics. Well, if I'm hearing you correctly, you seem to be, in reciting the facts, that the mother was a part of the arrangement, perhaps the instigator of the arrangement of a fraudulent marriage, and that she would have testified about the father's having been persecuted when this Petitioner was very young. Is that more or less correct? Well, she would have been a recipient witness of the persecution and also a witness as a qualifying relative on the hardship waiver. In other words, the record showed that she was 70 years old. She had arranged the marriage for her son to come, which is not direct evidence of a fraudulent marriage on the part of the Petitioner. No, but she did it. And I don't think that's the case. Well, I guess what I'm trying to understand is that wouldn't be necessarily the material as to hardship or persecution, the fact that she arranged the marriage. But what – how did she help him? How would she have helped him by testifying to the father's persecution? We know that she arranged the marriage by paying for the woman to go to – for the ex-wife to go to China. But as she'd been permitted to testify, she would have – the evidence could have  And if she hadn't, at that age, she would have suffered extreme hardship because she was living with a son and because she was – she was hard-pressed enough to arrange a marriage for her son to come. And just because, incidentally, just because – How old was she when she testified or would have tried to testify? At the time, again, she was 70, Your Honor, and she's now 75. So if she'd been – Well, it's the hardship to her that you're talking about, then. Correct, Your Honor. Sitting in – okay. She was in court. She even took the oath. And it wouldn't have really been a very big administrative inconvenience for the court to have either convened or adjourned for a short time to find an interpreter or they get on the phone. There's 250 judges in this – across the nation. They probably do this 50 times a day, Your Honor. Get on the phone. Get an interpreter. It's not really a very big deal when you balance it against the big-ticket item of this sole witness of the hardship waiver. It looks like the BIA has addressed your – has largely addressed this in its last paragraph. It says, look, whatever the positive factors, these do not outweigh his attempt to secure lawful permanent residence in this country through a fraudulent marriage and his failure to show remorse. We don't – actually, Your Honor, we don't even know what the balancing act entailed. The judge – the immigration judge simply said, you defrauded the court, you defrauded the United States, but there was no direct evidence of that. The evidence showed that the mother paid at one time and that the cousin – He didn't know he was entering into a fraudulent marriage? We don't have evidence to show that, Your Honor. Really? Well, we know that he came here based on the fiancé visa that the mother – I mean Did he ever testify that it was a – he didn't testify, did he? He did testify. There's no direct testimony. Nobody, unfortunately, asked him, didn't you know that it was a – Do you think it was an arranged marriage? No doubt, Your Honor. I don't think it's so unusual, at least not in the culture that I'm aware of, for parents to arrange. And he could – the evidence could have showed, hey, Mom, you know, don't be arranging marriages for me. Let me do my own thing. But what we do know is the mother arranged it. But what's most telling is the denial of the opportunity for her to testify. And Judge wrote – The I.J. has certainly – has certainly suggested that because she was complicit in this, that there is no way that the balancing of the equities would have resulted in an exercise of discretion in their favor. That's the one thing that he mentioned, Your Honor. But we don't have any evidence of complicit in the sense that it was a scheme. Well, if she was clearly complicit and if she is now the reason for the hardship, it seems like the whole thing is just a house of cards. Well, if she – the fact that she paid and arranged this marriage is not – does not mean that she's not going to suffer extreme hardship in the event – especially in the event her son had to be removed. I mean, she was desperate enough to want her son to be in the United States with her. It's not that he couldn't have come because she could have petitioned for him. And that's not really a balancing of all of the equities. And after all, you know, in – Judge Schroeder has pointed out, if I may paraphrase the judge, that due process, the core of due process is fairness. It just doesn't seem very fair to deny her the opportunity to testify. Also, with respect to the age, that somehow the judge bought the argument that the trial attorney had – the immigration trial attorney had advanced to the court that Judge Bybee had sat on, the Hernandez-Ortiz case. He was telling the judge, it's – this case is distinguishable because our particular petitioner here did not witness or experience physical harm. But that – there was – the evidence in Hernandez-Ortiz wasn't that. And two years later, last year, this Court held in Mendoza – Mendoza-Perez, I think, in May of 2012, where this Court – not this panel, but the Ninth Circuit had found that even an infant can be the subject of persecution. In that case, the petitioner, the mother who was applying for asylum – excuse me, the petitioner of Mendoza was actually a fetus at the time his mother was being persecuted. And he was – when – after he was born, he was malnutritioned. Twenty years later, he – after he entered the United States without inspection, he applied for asylum. And in that case, the Court found that the mere fact that he was an infant nevertheless could be the subject of past persecution. So the judge, the immigration judge, for whatever reason, bought the argument of the trial lawyer, which was not the facts of Hernandez-Ortiz. He thought it – the law required actual persecution and – just of a child. And it just wasn't – that just ain't so. Okay. Counsel, you have about three minutes, if you'd like to reserve that for rebuttal.  Thank you very much, Your Honor. All right. Let's hear from the government. May it please the Court, Anna Nelson for Respondent, Attorney General. This Court should deny this petition for review for the following reasons. First, the record does not compel the reversal of the agency's determination that he is removable as an alien who sought an immigration benefit by applying for adjustment of status based on his marriage to a U.S. citizen who confessed to being paid to marrying him and to never intending to establish a married life together. Second, Congress mandated that the agency's discretionary denial of Yi's application for a 212-I waiver of inadmissibility is not subject to this Court's review. Third, the record evidence does not compel the conclusion that Yi is eligible for withholding a removal or protection under CAT when he was never personally harmed in China for the 35 years that he lived there and only bases his claim on an event that happened to his father in 1971 that Yi learned about years later and never stated that it actually affected him in any way. And finally, the immigration judge did not clearly abuse this discretion by denying Yi's request for continuance when Yi failed to comply with the local operating procedures and also failed to establish a good cause for a continuance. I didn't catch that last sentence. And he also failed to establish a good cause for continuance. And an immigration judge can deny continuance if good cause is not shown, which it was not in this case. First, the record evidence does not compel reversal of the agency's finding that Yi is removable as charged. The issue here is whether Yi and his ex-wife, Chu, entered into the marriage solely to obtain a benefit and further the analysis The record's pretty clear on this one, isn't it, counsel? It was. And it was DHS's burden. And the IJ found that what DHS submitted was clear and convincing evidence. There's a record of sworn statement where Chu admitted that she was paid. She stated that they never lived together. They never consummated the marriage. Did she travel to China? She traveled to China at one time, I think, to get paid or meet Yi is in the record. And then they were married in the United States? In the United States. He traveled here on a fiancé visa. He traveled here to the United States and got married. And never lived together. And never lived together. And Ms. Chu stated that in the record of sworn statement, which was submitted, she had also testified during her adjustment of status interview, and an officer testified at the removal proceedings. The immigration judge also based his decision on that. And also. And the mother paid her? Excuse me? And the mother paid her? The mother paid her $10,000. And also. So the mother must have had some resources available to be able to. I don't know if she worked or whatever. She wasn't impoverished, at least. She came up with $10,000. Right. And it's not clear from the record why or how. But the evidence is that Ms. Chu was paid, that they never lived together, that they never consummated the marriage. That's never been denied. To the extent that Petitioner argues that it could have been an arranged marriage, that speculation that he believed that that was the case, that was enough for clear and convincing evidence to find that the marriage was before the intent of being married. What does the record show with respect to why the continuance was denied to permit her to testify? The continuance was denied. The local operating procedures for that court, which there are regulations stating that immigration courts or that the Attorney General is able to make regulations to expedite the process. And so the local operating procedures for that court state that 15 days before a merits hearing, all witnesses need to be proffered with an explanation of what they're going to testify to as well as if an interpreter will be needed. And in this case, six days before the hearing, Petitioner offered a statement that he wanted his mother to be a witness and stated that she would testify for 15 minutes based on the alleged persecution that happened to his father. And at the merits hearing. At that point, did they request a translator? No. And everyone was. There had been an earlier continuance. Is that right? There have been many continuances in this case. The merits hearing that this was, the Petitioner had stated he wasn't going to testify, his mother was going to testify for 15 minutes. And the Petitioner, they had a Cantonese interpreter there in case the Petitioner wanted to testify himself. Everyone was under the impression that that would be the interpreter. And at the hearing, it came to the immigration judge's attention that the mother couldn't really understand Cantonese and needed a different kind of interpreter. So they spoke different languages? The mother and the son spoke different languages? Apparently different dialects. And the immigration judge didn't outright deny the mother's testimony. He actually had her come up, swore her in. She couldn't. She stated that she couldn't quite understand the Cantonese interpreter. That's when Youth Council moved to continue the hearing. The immigration judge heard from both parties on why it should be continued. He considered, he let Youth Council proffer testimony, what she would testify to, even before the immigration judge. She just stated that it would be, she would testify to what happened to Yi's father in China. And as this Court mentioned, that really wouldn't have an effect on Yi's persecution claim. She couldn't testify that he was harmed or had an effect, which he himself never stated. Did Council represent what hardship she would testify to? Never. They never, Council did not state that she was going to testify that she was a qualifying relative. I believe the government attorney brought that up and still, Youth Council never stated. He could have proffered testimony and given some example of what her hardship would be, stated.  She's a citizen. She became a citizen through respondents, or through petitioner's sister. But at no point in any of the proceedings has. She became a citizen through what now? Through Yi's petitioner's sister. Through her daughter. Her daughter. Right. So the immigration judge did not. So she had a daughter in the United States of America. And she was a citizen.  And she's a citizen of the United States as well. Right. Right. Who is, must be a citizen. Who is a citizen. Correct. Okay. But before, the immigration judge did not abuse discretion based on finding no good cause to a continuance. He allowed both parties to present, to argue why there would be a good cause. Just make sure, I don't want to belabor this, but the only reason for her testimony that was proffered was that she was going to testify as to what had happened to his father when he was a very young child. Correct. Okay. And so to find now that the immigration judge abused his discretion by denying based on factors that weren't even presented to the immigration judge is not... Do you know anything about the $5,000 from the cousin that was just alluded to? That was what Chu had told the officer, both the officer and the adjustment of status interview. And there's an I-213 in the record that DHS submitted as part of its evidence where Chu also gave testimony to two other officers, and she had explained that her cousin had talked her into this marriage, into accepting the $5,000. Her cousin had. Her cousin. Okay. So did the money come from the cousin or from the mother? It came from Yi's mother, as far as we can tell. Anything further, counsel? No. Thank you. Thank you very much. Mr. Wu, you have a little bit of time reserved. Thank you, Your Honor. I know the Court is concerned with how come Respondent or, excuse me, Petitioner did not provide a full list of what the mother was going to talk about under the court rules. But that really should not be dispositive when we... According to the government, you also had an opportunity to proffer what the mother would say. So the I.J. was willing to listen to what counsel said. Here's what she would testify to and here's why it's important. Even if she said, even if Petitioner did not make, provide a list of what the mother was going to say, the Court still should have proceeded to hear from the mother. Indeed, in the case, the law in this circuit has been that where due process is concerned, where the judge's duty is to develop a complete record, he has the obligation to interrogate the witnesses. There's been cases where witnesses have been permitted, excuse me, where an immigration judge refuses to permit a witness to testify, but this Court has reversed because there's prejudice. If there's prejudice, you have to let the witness testify. In Oshadi, this Court decided not that long ago where it's a little bit different, but it's in the same vein of let the person have his or her day in court. Let's hear the evidence. In this case, the judge says no. But only three weeks before that hearing, Your Honor, the judge made the ruling that this Respondent on finding this Petitioner committed marriage fraud. And three weeks later, they had the hearing. At that time, the mother showed up. And it the Court did not rule on the request of Petitioner to ask the maker of the I-213, which was the investigative report when they interviewed the former spouse where she said, well, I did it because I was greedy. She had been paid $5,000 to go to China, which she did do, and apply Petitioner to meet the Petitioner where they apparently decided, okay, we're going to get married. Come as my fiance. And so she came back. Afterwards, the mother paid another $5,000. But because there was not a single question of the mother, we don't know how to what extent she had to go through to get that money. I mean, it was obvious that because she came from China, because of her advanced age, she did not have a lot of resources. But it was important enough for her to arrange the marriage. So what would you – what would the proffer have been? I mean, what would you believe that the hardship to her – Well, if she had been allowed to testify, Your Honor – What would she have said? First of all, she would have – she could have explained why she made the arrangement. In other words, she could have clarified whether – She wanted her son in the United States. And whether it was really a – you know, in other words, I'm – she could have clarified the extent of the fraud, as it were. In other words, was it a real sleazy, arranged deal, or was it because, you know, if they hit it off, they could have been married forever. But apparently it didn't work that way. But thank you very much for listening. Thank you. Thank you, counsel. We thank counsel for the argument. And D v. Holder is submitted for decision. The next item on the calendar is ITALA v. United States Citizenship and Immigration Services.
judges: Beistline, Schroeder, Bybee